UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CASE NO. 1:21-cr-759 |
| | ) | |
| PLAINTIFF, | ) | JUDGE SARA LIOI |
| | ) | |
| vs. | ) | |
| | ) | MEMORANDUM OPINION |
| ANTONIO TAYLOR, | ) | |
| | ) | |
| DEFENDANT. | ) | |

Now before the Court is the motion of defendant Antonio Taylor ("Taylor") to suppress all evidence found on his person following a search on July 28, 2021.[1] (Doc. No. 36 (Motion to Suppress).) Plaintiff United States of America (the "government") opposes the motion. (Doc. No. 37 (Response).) On December 20, 2023, the Court conducted an evidentiary hearing on the motion. At the conclusion of the hearing, the Court took the motion under advisement. For the reasons that follow, Taylor's motion is DENIED.

**I.   BACKGROUND**

Officer James Norwillo ("Officer Norwillo"), who worked for the Cuyahoga Metropolitan Housing Authority Police Department ("CMHA") at the time of Taylor's arrest, was the only witness to testify at the evidentiary hearing. Officer Norwillo testified that he and another CMHA

---

[1] At different points throughout the evidentiary hearing, plaintiff's attorney referenced the incorrect date for this particular incident and was not affirmatively corrected by Officer James Norwillo. At first, the attorney asked Officer Norwillo about events that occurred on October 28, 2021. Later, the attorney attempted to correct himself by stating that he previously misspoke and he meant to say July 28, 2020. Nonetheless, Officer Norwillo's testimony, the body camera video submitted into evidence during the hearing, and the parties' briefing make clear that Taylor's interactions with Officers Norwillo and Roberts occurred on July 28, 2021, beginning at around 2:00 a.m.

officer, Noelle Roberts ("Officer Roberts"), arrived at a public housing complex located at 1675 Ansel Road, Cleveland, Ohio in the early morning of July 28, 2021, to respond to a disturbance call for a female screaming on the 16th floor of that building. Upon his arrival, Officer Norwillo, a four-year veteran of the CMHA at the time, turned on his body camera, which captured his subsequent interaction with Taylor. Pertinent portions of the video were played during the evidentiary hearing. (Gov. Ex. A (Body Camera Recording).)

When the officers arrived at 1675 Ansel Road, they went to the 16th floor and searched for the screaming woman. The officers did not immediately locate her. While continuing their search on an exterior hallway of the 16th floor, the officers heard a woman being "very loud" on a floor below them. From their vantage point, the officers could look down to the source of the noise: the atrium of the 13th floor directly adjacent to the elevators. In this area, the officers observed four figures in the atrium. This group included the woman being "very loud" and a black male wearing a white t-shirt sitting on the windowsill. This man was later identified as the defendant, Antonio Taylor.

As the officers looked down at the group of people gathered on the 13th floor, Officer Norwillo observed a hand-to-hand transaction occurring. Officer Norwillo asked Officer Roberts if she just saw Taylor pull out a "big ol' bag of something." As the officers walked back towards the elevator, Officer Norwillo informed the dispatcher what he just observed from the 16th floor, including "drug activity" and a "male [Taylor] doing hand-to-hand transactions."

Arriving at the 13th floor, Officer Norwillo announced the officers' presence to the group of four individuals who were still gathered near the atrium windows. As the video makes clear, Taylor was hunched in an unnatural position with his right hand between his legs. After a brief

2

conversation with the group regarding why the officers were there, Officer Norwillo asked Taylor, "What are you doing there? What do you have in your hand?" Taylor responded evasively and then stated that he had "weed" in his right hand. After this comment, Officer Roberts approached Taylor, grabbed him, and instructed him to show his right hand. Taylor did not show his hand. While this was occurring, the woman whom the officers heard from the 16th floor took a few steps to look behind Officer Norwillo and speak to another person in the hallway. Officer Norwillo told the woman, "Woah, we are all in this together[,]" strongly implying that she should not leave at that moment.

For a brief period, Taylor and the officers went back and forth on the propriety of the officers' questions and requests. At multiple points, the officers told Taylor to show his right hand. Taylor still did not remove his hand from between his legs. Officer Roberts continued to grab Taylor's left arm throughout this portion of the interaction.

In light of his non-compliance, Officer Norwillo moved closer to grab Taylor so that he could detain him and put him in handcuffs. The officers were not able to do this, however, because shortly after Officer Norwillo grabbed Taylor, Taylor stood up, broke away from both officers, and ran down the hallway. When Taylor stood up to flee from the officers, he removed his right hand from between his legs and Officer Norwillo was able to observe a clear bag holding a white powder. This clear bag containing white powder, which was later identified as cocaine, was also visible on the body camera footage.

Taylor's escape did not last long. Within ten seconds, Officer Norwillo deployed his taser, Taylor fell to the ground, and he was subsequently subdued and handcuffed by the officers. Taylor's brief escape was sufficiently long, however, for a firearm to fall from his person onto the

floor. In addition to this firearm, law enforcement officers also recovered the plastic bag Fortson was holding in his right hand, which the government claims contained cocaine. (Doc. No. 37, at 5.[2]) Taylor is now charged in a two-count indictment with: (1) being a felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1); and (2) possessing a controlled substance (cocaine) with intent to distribute in violation of 21 U.S.C. § 841(a)(1). (Doc. No. 1.)

Taylor's interaction with the police on July 28, 2021, continued considerably longer than the episode just described, but Taylor limits his suppression motion to law enforcement's conduct during this time period. The Court's analysis is thus similarly limited.

## II.   LAW GOVERNING WARRANTLESS POLICE ENCOUNTERS

Police may engage in a warrantless encounter with a citizen under three circumstances: (1) consensual encounters in which contact is initiated by a police officer without any articulable reason and the citizen is briefly asked questions; (2) a temporary involuntary detention or *Terry* stop (based on *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968)), predicated on reasonable suspicion; and (3) arrests based on probable cause. *United States v. Pearce*, 531 F.3d 374, 380 (6th Cir. 2008). Taylor's motion to suppress only involves the first two types of warrantless police encounters, and both are discussed in turn.

---

[2] All page number references within this memorandum opinion are to the consecutive page numbers applied to each individual document by the electronic filing system.

*A. Consensual Encounters*

For the purposes of the Fourth Amendment, a warrantless consensual encounter with a law enforcement officer largely resembles a consensual conversation. Police officers do not violate an individual's rights under the Fourth Amendment if they "approach[] an individual on the street or in another public place, [ask] if he is willing to answer some questions, [put] questions to him if the person is willing to listen, or [offer] in evidence in a criminal prosecution [the individual's] voluntary answers to such questions." *Florida v. Royer*, 460 U.S. 491, 497, 103 S. Ct. 1319, 75 L. Ed. 2d 229 (1983). Warrantless consensual encounters may also occur in places that are not public or "on the street." *See, e.g.*, *United States v. Campbell*, 486 F.3d 949, 952, 956–57 (6th Cir. 2007) (finding a consensual encounter occurred in a parking lot of a private business where the law enforcement officer began the interaction by asking a motorist if "everything was okay"). Unlike the other two types of warrantless encounters law enforcement officers have with citizens, the police do not need to have probable cause or reasonable suspicion to engage in consensual encounters. *See id.* at 954 (citing *United States v. Alston*, 375 F.3d 408, 411 (6th Cir. 2004) ("[B]ecause a consensual encounter does not amount to a seizure, a police officer does not need reasonable suspicion or probable cause before approaching an individual to make an inquiry.")).

When evaluating if an interaction with a law enforcement officer was a consensual encounter, courts "must consider all the circumstances surrounding the encounter to determine whether the police conduct would have communicated to a reasonable person that the person was not free to decline the officers' requests or otherwise terminate the encounter." *Florida v. Bostick*, 501 U.S. 429, 439, 111 S. Ct. 2382, 115 L. Ed. 2d 389 (1991). "In a consensual encounter, 'law enforcement officers may ask citizens general questions without having any reasonable suspicion

of criminal activity, so long as the officers refrain from the type of intimidating behavior that would lead a reasonable person to believe that the person was not free to leave.'" *United States v. Dingess*, 411 F. App'x 853, 855 (6th Cir. 2011) (quoting *United States v. Davis*, 514 F.3d 596, 607 (6th Cir. 2008)). "Whether an encounter between a police officer and a citizen is consensual depends on the officer's objective behavior, not on any subjective suspicion of criminal activity." *Id.* (quoting *Davis*, 514 F.3d at 607). Factors indicating a seizure, in contrast to a consensual encounter, include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's requests might be compelled." *United States v. Gross*, 662 F.3d 393, 399 (6th Cir. 2011) (quoting *United States v. Mendenhall*, 446 U.S. 544, 554, 100 S. Ct. 1870, 64 L. Ed. 2d 497 (1980)).

Here, there is no evidence that the CMHA officers raised their voice, used intimidating language, or displayed their weapons when they first engaged the group of individuals gathered on the 13th floor. Instead, the officers calmly discussed the reason they were called to the building and whether the source of the original noise complaint was still present in the building. Until Officer Roberts approached Taylor to grab him, a reasonable person in Taylor's position, under the totality of the circumstances, would have thought that he was free to stop talking with the officers and terminate the encounter.[3] Given these facts, the Court finds this part of Taylor's

---

[3] During the evidentiary hearing, Officer Norwillo stated that "from the time [he] got off of the elevator" on the 13th floor, Taylor was not free to leave. This statement, on its own, does not change the analysis above. The nature of an individual's interaction with police is determined by the *objective* circumstances surrounding the arrest, not the subjective intentions of a law enforcement officer. *See Dingess*, 411 F. App'x at 855 (citing *United States v. Davis*, 514 F.3d 596, 607 (6th Cir. 2008)). Given the evidence produced at the hearing, Officer Norwillo's subjective intent to prevent Taylor from leaving did not have any objective manifestations until after Officer Roberts grabbed him.

interaction with police to be a consensual encounter, which did not require reasonable suspicion.[4] As such, the officers' initial questioning of Taylor was constitutionally sound.

When Taylor's arm was grabbed by Officer Roberts, the nature of the encounter evolved into a *Terry* stop. A law enforcement officer making physical contact with an individual is, unsurprisingly, an important factor for determining if a reasonable person would consider himself free to terminate the encounter with the officer. *See, e.g.*, *Gross*, 662 F.3d at 399 (quoting *Mendenhall*, 446 U.S. at 554) (listing "physical touching" as a factor for finding that the stop was not consensual); *United States v. Spencer*, No. 1:10-cr-108, 2011 WL 379107, at *4 (S.D. Ohio Feb. 2, 2011) (finding that a warrantless consensual encounter began when the officer "grabbed [the d]efendant's arm[]" to further investigate if that defendant just dropped a gun from his person).

Beyond Officer Roberts grabbing Taylor, two other developments, which occurred shortly after officer Roberts made physical contact with Taylor, also made clear that a reasonable person in Taylor's position would not feel free to terminate the encounter. First, while holding Taylor's left arm, Officer Roberts clearly instructed Taylor to show his right hand in a tone which suggested Taylor needed to comply. Second, when the "very loud" woman took a few steps around Officer

---

[4] Taylor contends that the officers "lacked reasonable suspicion to initiate the *interaction*, and detention of Mr. Taylor[.]" (Doc. No. 36, at 5 (emphasis added).) As stated above, the Court does not need to reach this question because the interaction began as a consensual encounter. Nonetheless, even if the Court determined that the *Terry* stop began as soon as the officers arrived on the 13th floor, the officers also had reasonable suspicion at that moment. *See, e.g., Irvin v. City of Shaker Heights*, 809 F. Supp.2d 719, 730 (N. D Ohio 2011) (citing *United States v. Sweeney*, 402 F. App'x 37 (6th Cir. 2007) ("When a police officer witnesses a hand-to-hand exchange in an area known for drug transactions, the officer has reasonable suspicion to believe that criminal activity is afoot."); *United States v. Slaughter*, No. 3:15-cr-133, 2016 WL 8673056, at *6 (W.D. Ky. Oct. 14, 2016) (holding that "[t]he direct observation of what reasonably appeared to be a hand-to-hand drug transaction conducted a mere 30 feet from where the officers were situated" was, by itself, "sufficient to establish reasonable suspicion for a Terry stop"), *report and recommendation adopted*, 2017 WL 44950 (W.D. Ky. Jan. 4, 2017). Officer Norwillo testified that he was trained and experienced in identifying hand-to-hand transactions of illicit drugs. When Officer Norwillo observed a hand-to-hand transaction in the 13th floor atrium, he immediately radioed in his observations of suspected drug activity to the police station. Officer Norwillo's training, experience, and personal observations on the 16th floor was enough to support a finding of reasonable suspicion.

Norwillo in an attempt to speak with an individual down the hall, Officer Norwillo said, "Woah, we are all in this together now." A reasonable person would have interpreted this statement by Officer Norwillo to mean that all members of the group, including Taylor, were not free to leave until, at a minimum, the group answered the officers' questions. Taken together, Taylor was seized by police when Officer Roberts grabbed his arm.[5]

  B. *Terry Stops*

With regard to an investigatory detention, or *Terry* stop, "police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *United States v. Sokolow*, 490 U.S. 1, 7, 109 S. Ct. 1581, 104 L. Ed. 2d 1 (1989) (quoting *Terry*, 392 U.S. at 30). The officer "must be able to articulate something more than an inchoate and unparticularized suspicion or 'hunch.'" *Id.* (quoting *Terry*, 392 U.S. at 27). Still, "[t]he officers need only 'a particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *United States v. Sheckles*, 996 F.3d 330, 343 (6th Cir. 2021) (quoting *Kansas v. Glover*, 140 S. Ct. 1183, 1187, 206 L. Ed. 2d 412 (2020)). Moreover, that there may be a possible innocent explanation for each fact when considered separately does not defeat a finding that, together, the facts contribute to reasonable suspicion. *See United States v. Arvizu*, 534 U.S. 266,

---

[5] The government suggests, without much explanation, that there may have only been an "attempted seizure" at this point of the interaction because Taylor did not actually submit to the officers. (Doc. No. 37, at 8.) This is incorrect. While it is true that "actual submission" is required in some circumstances for a seizure to occur (*see United States v. Jones*, 562 F.3d 768, 774 (6th Cir. 2009)), the rule does not extend to situations, like the present case, where officers apply physical force to the suspect. *See United States v. Smith*, 594 F.3d 530, 536 (6th Cir. 2010). For this reason, the Sixth Circuit has alternatively formulated the test for whether an interaction was an actual seizure, and not merely an attempted seizure, as "the encounter must not be consensual and the officers must use physical force *or* the individual must submit to the officers' show of authority." *Id.* at 535 (emphasis added). As stated above, the officers' encounter with Taylor had ceased to be consensual at this point, and Officer Roberts maintained control of Taylor's left hand. This is sufficient to reject the government's argument that this part of the officers' interaction with Taylor only amounted to an attempted seizure.

274, 122 S. Ct. 744, 151 L. Ed. 2d 740 (2002). This is true even if these facts "would arouse suspicion only in someone experienced in law enforcement matters." *United States v. Garza*, 10 F.3d 1241, 1245 (6th Cir. 1993); *see Arvizu*, 534 U.S. at 273–78 (explaining that officers may rely on their experience in evaluating totality of circumstances and "need not rule out the possibility of innocent conduct").

Observing an individual engage in a hand-to-hand transaction involving cash and a "big ol' bag" of something (which Officer Norwillo immediately reported to dispatch that, based upon his experience, he believed was a drug transaction) coupled with subsequent evasive conduct by the individual is more than sufficient to create reasonable suspicion that illicit drug activity is occurring. *See, e.g.*, *United States v. Paulette*, 457 F.3d 601, 606 (6th Cir. 2006). In *Paulette*, two police officers observed the suspect and another individual "engage in a hand-to-hand transaction[]" which, due to the officers' "knowledge of the [geographical] area and experience with drug crimes[,]" they believed to be a transaction involving illegal drugs. *Id*. at 602. When the officers approached the suspect, "he quickly moved his hand to his pocket and began to walk away from officers." *Id*. The officers caught up to the suspect and eventually detained him. *Id.* When they conducted a pat down search, they discovered two bags of marijuana on his person. *Id*. The Sixth Circuit affirmed the district court's denial of the suspect's motion to suppress because "the officers had a reasonable suspicion that [the suspect] was engaged in criminal activity based upon his hand movements consistent with drug-dealing activity, efforts to evade the police upon noticing them, and presence in a high crime area." *Id*. at 606.

The pertinent facts in this case largely mirror those in *Paulette* and demand a similar result. During the evidentiary hearing, Officer Norwillo testified that he was trained in identifying

9

suspected hand-to-hand drug transactions and that he had previously observed around two dozen suspected hand-to-hand drug transactions during his four years with the CMHA. During the early morning of July 28, 2021, from an external hallway on the 16th floor, Officer Norwillo observed Taylor engage in a suspected hand-to-hand drug transaction on the 13th floor atrium and contemporaneously radioed in his observation and suspicion to the police station. Upon the officers' arrival to the 13th floor, and before the *Terry* stop begun, Taylor's unnaturally hunched posture and hand positioning suggested an effort to conceal something from the officers. Finally, the parties' briefings both described the building at 1675 Ansel Road as a location "known for drug activity."[6] (Doc. No. 36, at 6; Doc. No. 37, at 8.)

These facts, taken together, amount to a "particularized and objective basis" sufficient to create a reasonable suspicion that illicit drug activity was occurring. Thus, the officers had reasonable suspicion to engage in a *Terry* stop, and Taylor's Fourth Amendment rights were not violated by this part of his interaction with law enforcement.

---

[6] The defendant's concession that the location in question was "undeniabl[y] . . . known for drug activity" (Doc. No. 36, at 6) is sufficient to establish this fact for the purposes of this motion. In addition to this concession, though, Officer Norwillo testified that there were many complaints of "drug activity" at this location, which he defined as intoxication (involving illegal drugs or alcohol). Officer Norwillo also testified that he could not recall going to this particular location to investigate hand-to-hand drug transactions or previously observing a drug transaction while on the property for another reason, but such a sighting is not required to prove that this particular housing complex was "known for drug activity." In any event, even without this concession, the Court finds that the presence of all of the other facts described herein was sufficient to create a reasonable suspicion that an illicit drug transaction was occurring.

### III.  CONCLUSION

The record establishes that Officers Roberts and Norwillo initiated a consensual encounter with Taylor on July 28, 2021, that ripened into a *Terry* investigative stop, and that the officers had reasonable suspicion that Taylor was engaged in illegal drug activity, thereby giving the officers a sufficient basis for the stop.

Accordingly, Taylor's motion to suppress is DENIED.

**IT IS SO ORDERED**.

Dated: January 9, 2024

**HONORABLE SARA LIOI
CHIEF JUDGE
UNITED STATES DISTRICT COURT**